[Civil No. 752. Filed March 21, 1901.]

[64 Pac. 435.]

## THE SUN DANCE GOLD MINING COMPANY, a Corporation, et al., Defendants and Appellants, v. A. C. FROST, Plaintiff and Appellee.

1. Trusts — Resulting Trust — Fraud — Pleading.—F. and D., who lived in Chicago, became joint purchasers of certain mining property in Arizona, the deed being placed in escrow in Prescott, in the name of F. for the benefit of both, said deed containing a forfeiture clause on the non-payment of any of the installments of the purchase price by F. Thereafter a corporation was formed to own and operate the mine, and an agreement was entered into

Arizona 7—19

whereby F. was to transfer the mining property to the corporation and receive in payment therefor a certain amount of stock issued to himself and D. Shortly before a certain payment became due, D. went to Arizona, F. paying half the expense of the trip, for the purpose of becoming thoroughly acquainted with the property in order to more effectually sell the stock. D. agreed to make the next payment when it fell due, or to notify F. in time for him to do it. Upon his arrival in Arizona, D. represented that F. was irresponsible and had no intention of completing the purchase. He then secured an agreement from the owner of the property that it was to be conveyed to him upon the same terms, provided F. failed to make the payment. D. then notified F. that he had secured an extension of time for the payment. After default in payment, D. secured and transferred the property to the defendant corporation, which had full knowledge of the facts, and received therefor the stock which should have been issued to himself and F. In an action by F. to recover from D. and the corporation the value of the stock which should have been issued to him, *held*, that a complaint setting out the above facts stated a good cause of action, and a demurrer thereto was properly overruled.

2. SAME — SAME — SAME — SAME — FRAUD NEED NOT BE ALLEGED IN ACTION AGAINST TRUSTEE FOR APPROPRIATING PROPERTY OF CESTUI QUE TRUST.—Where F. and D. were jointly interested in the purchase of certain mining property and its transfer to a corporation for stock therein, and D. secured the issuance of all the stock to himself, to the exclusion of his co-owner and partner in the transaction, the fiduciary relations existing between F. and D. render it unnecessary for F. to allege and prove actual fraud in an action to recover from D. the value of the stock which should have been delivered to him.

3. SAME—SAME—SAME—CORPORATION—LIABLE TO CESTUI QUE TRUST WHERE IT TRANSFERS HIS PROPERTY TO TRUSTEE WITH NOTICE OF FRAUD.—Where F. and D. were jointly interested in the purchase of certain mining property and its transfer to a corporation for stock therein, and D. secured the issuance of all the stock to himself to the exclusion of his co-owner and partner in the transaction, by certain fraudulent acts, and the corporation had full knowledge of the whole transaction, *held*, that the corporation by so transferring the stock to D. rendered itself liable to F. for the value of his share thereof.

APPEAL from a judgment of the District Court of the Fourth Judicial District in and for the County of Yavapai. Webster Street, Judge. Affirmed.

The facts are stated in the opinion.

E. M. Sanford, for Appellants.

This case is not within the doctrine of resulting trusts, for Frost paid nothing on account of his stock. *Bland* v. *Talley,* 50 Ark. 71, 6 S. W. 235.

Fiduciary relations must result from the original contract. It cannot result from matter *ex post facto.* It is clear that it must arise out of facts and circumstances as distinguished from a mere parol promise or contract or a mere non-payment of the consideration of the Frost option. *Lovett* v. *Taylor,* 54 N. J. Eq. 311, 34 Atl. 898; *Boying* v. *Cheeseborough* (N. J.), 36 Atl. 900.

So where one agrees to purchase real property or personal property and give another an interest in it, and he purchases and pays his own money, no trust can result. *Levy* v. *Evans,* 57 Fed. 683.

Kretzinger, Gallagher & Rooney, for Appellee.

The community interest and partnership relation existing between Davies and Frost rendered it legally impossible for Davies to go behind the back of Frost and secure a new option in his own name for his sole benefit. His attempt to do so did not in equity work a change of the legal situation of the escrow agreement or the rights of the parties with respect thereto, but left wholly unaffected the half-interest of each in the property, Davies becoming a trustee to the extent of the half-interest owned by Frost. *Davis* v. *Hamlin,* 108 Ill. 39, 48 Am. Rep. 541; *Yoemans* v. *Lasley,* 50 Ohio St. 200; *Hulett* v. *Fairbanks,* 40 Ohio St. 244; *Van Horn* v. *Fonda,* 5 Johns. Ch. 407; *Rothwell* v. *Dawes,* 2 Black (U. S.) 613; *Miller* v. *O'Boyl,* 89 Fed. 140; *Bennett* v. *Austin,* 81 N. Y. 322; *Jones* v. *Dexter,* 130 Mass. 380, 39 Am. Rep. 459, and note.

Under the strictest definition, Davies sustained a fiduciary relation to Frost in this transaction. Frost reposed confidence in his good faith. He relied upon his promise in going to Prescott. A fiduciary relation exists "wherever a trust, continuous or temporary, is especially reposed in the skill or integrity of another, or the property or pecuniary interest, in whole or in part, or the bodily custody, of one person is placed in charge of another." *Brundy* v. *Mayfield,* 15 Mont. 201, 38 Pac. 1067; *Fulton* v. *Whitney,* 66 N. Y. 548; *Ringo*

v. *Bines*, 10 Pet. 269; *O'Connor* v. *Irvine*, 74 Cal. 439, 16 Pac. 236; *Mitchell* v. *Reed*, 61 N. Y. 123, 19 Am. Rep. 252.

DOAN, J.—This was an action brought in the district court of Yavapai County by A. C. Frost, of Chicago, against L. A. Davies, of Chicago, and the Sun Dance Gold Mining Company, an Arizona corporation, then operating the Silver Traill and W. E. Thorne gold mines in Yavapai County, Arizona. The complaint sought to compel the defendants to pay to the plaintiff the reasonable and market value of two hundred thousand shares of the capital stock of the Sun Dance Gold Mining Company, and to have the amount found due to the plaintiff to be adjudged a first and prior lien upon the Silver Traill and W. E. Thorne mines. The complaint was demurred to by the defendants, and the demurrer was overruled. After hearing and argument, a decree was rendered that the plaintiff recover from Davies and the Sun Dance Gold Mining Company $11,435.94, being the value of two hundred thousand shares of stock in that company. From this judgment, and the denial of a motion for a new trial, the defendants appeal, and assign as errors: 1. That the court erred in overruling the demurrer of defendants to the amended complaint; 2. That the findings of the court are not supported by the allegations of the complaint and the law; and 3. That the court erred in its conclusions of law,—giving under each assignment definite specifications wherein the alleged errors were committed. The transcript of the evidence has not been furnished to this court, but the facts of the case as expressed in the findings of the lower court, and as recognized and practically admitted in the pleadings, are substantially these: Early in December of 1895 the plaintiff, A. C. Frost, while in Yavapai County, Arizona, met one A. J. Pickrell, the owner of the Silver Traill and W. E. Thorne mining claims, and obtained two reports thereon, and returned with them to Chicago. After his arrival in Chicago, the attention of Davies was called to the property, and on January 23, 1896, Frost and Pickrell entered into an agreement in writing, by the terms of which a deed to the property was placed in escrow in the Prescott National Bank, to be delivered on the payment of the purchase price of twenty thousand dollars in the amounts and on the dates therein specified,

with the usual forfeiture clause. After this, on February 12th, Frost and Davies entered into an agreement whereby they should jointly meet the payments; Davies should secure purchasers for the property, and he and Frost divide equally the profits realized on the sale thereof. This was a verbal agreement, with a memorandum of the terms expressed in a letter from Frost to Davies, produced in evidence on the trial. The first payment under this escrow agreement fell due on the 15th of February. At that time Frost and Davies sent a joint letter to one Dr. Vickers, in Prescott, wherein they each inclosed five hundred dollars, and dictated a different escrow agreement, changing the dates and the amounts of the remaining partial payments, and asked that this be substituted for the original agreement, and authorized Vickers to sign their names to the second agreement. This was done, the second agreement was duly signed by Pickrell, and the one thousand dollars accepted, and Frost's name was signed by Vickers, who explained that through an oversight Davies's name was not signed, but that the deal was made in his as well as in Frost's interest; and it was understood by Frost and Davies that Frost held the property for himself and Davies in accordance with their agreement for its joint purchase and disposal. In pursuance of this agreement, Frost and Davies caused the incorporation of the Sun Dance Gold Mining Company, with a capital stock of one million dollars, divided into one million shares of one dollar each. Frost and Davies and three other persons were elected as a board of directors. Davies was elected president of the company, and Frost secretary. At a meeting of this board of directors on March 6, 1896, it was agreed between Frost, acting for himself and Davies, and the Sun Dance Gold Mining Company, acting by its board of directors, that Frost should convey to the said company the said Silver Traill and W. E. Thorne mines in consideration of all of the capital stock of the company; that, in consideration of the company's repaying to Frost all the expenses he had incurred relative to the property, he was to transfer to the company two hundred thousand shares of stock, the proceeds of which should be used in the operation of the property, that four hundred thousand shares should be sold at five cents per share, and the proceeds applied to the payment of the amount remaining due to Pickrell, for the

purpose of securing the title; and that the other four hundred thousand shares should be issued to Frost and Davies as their property severally. The company and all its officers and directors had full knowledge of all the terms of this agreement, including the exact price Frost and Davies had agreed to pay Pickrell for the mining property, and the amount they were to receive as their respective profits on the consummation of the deal. After the completion of this arrangement, Davies left Chicago on March 9, 1896, for Arizona, for the ostensible purpose of examining the property, in order that he might personally vouch for its merits to persons whom he might interest in the stock. Davies, before leaving Chicago, represented to Frost that in case the second payment of two thousand dollars, due March 15th, should become due during his absence, he would either give to the owner his check for the amount, or telegraph Frost in ample time for him to make the remittance. The expense of Davies's trip to Arizona was estimated by him and Frost at one hundred and twenty-five dollars, and Frost advanced one half of this sum to Davies upon his departure from Chicago, and likewise gave him a letter of introduction to the owner of the property, stating that he was the president of the company recently organized for the purpose of buying and operating the property; that the object of his visit was to inform himself, for the benefit of the company, as to the existing conditions at the mine, and to determine what improvements might be necessary to accomplish the best results; and asked Pickrell to give him any information and extend any favors and courtesies that he might be able. Davies, upon his arrival in Prescott, represented to Vickers and Pickrell that Frost had no ability or intention to carry out the escrow agreement; that he (Davies) had contributed the payment already made; and on March 12th—three days before the date for the next payment under the Frost option—induced Pickrell to make another agreement with him personally, which provided that, if the payment under the Frost agreement be not made as required by its terms, Pickrell should execute to Davies a deed duplicate in description of the property, and upon the payment by Davies of any balance remaining unpaid under the Frost agreement, after crediting to Davies all payments previously made on the purchase price, would deliver said

deed to Davies, provided Davies should deliver to him, in excess of the purchase price, five thousand shares of the said company's stock. After securing this agreement, Davies at once returned to Chicago, and for some ten days concealed from Frost the execution of the last agreement. Upon representing to Frost that he had secured from Pickrell a short extension, and could sell the stock in ample time to meet the second payment, he obtained from Frost the stock certificates and book, seal, and other papers of the company, and by the use of the stock certificates thus obtained he procured two thousand dollars by the sale of stock on March 21, 1896, and remitted the same to Pickrell, whereupon the formal deed transferring the mining properties to Davies alone was placed in escrow under and in pursuance of the agreement secured by Davies from Pickrell on March 12th. Davies then told Frost that he could not raise any money on the stock, and that their option was lost. Davies was still in possession of the seal, stock certificates, and books of the corporation, and soon afterwards Frost was displaced as an officer and director of that company, and the conveyance of the property was made by Davies to the company, in consideration of which two hundred thousand shares of stock were put into the treasury for development and operation of the property, four hundred thousand shares were sold to complete the purchase and pay Pickrell, and four hundred thousand shares were issued to Davies as his personal stock, and were received and retained by him. The company issued these four hundred thousand shares of stock to Davies for his personal use with the full knowledge of the facts heretofore stated. The company failed to transfer any stock to Frost. Davies failed and refused to transfer any stock to Frost, or to pay any of the expenses incurred by Frost in the examination and procurement of the property, or to return the one half of the first payment theretofore made by Frost. At the time of the issuance of the four hundred thousand shares to Davies, and for some time thereafter, and at the beginning of this suit, the stock was of the value of $4\frac{1}{8}$ cents per share. Neither Davies nor the company paid anything to Frost for his interest in the property or his services or expenses in securing or in organizing the company.

The court held, as conclusions of law, that Davies was,

before and on March 12th, interested with Frost in the promotion and sale of the property in question in such a manner as to preclude him from securing any interest therein antagonistic to Frost; that Davies held the agreement in his own name secured from Pickrell on March 12, 1896, and all rights thereunder, for the benefit of himself and Frost, and that the Sun Dance Gold Mining Company, having full knowledge of that fact, and of the relation existing between Frost and Davies, the conveyance from Davies to the company inured to the benefit of both him and Frost, and the company was charged with knowledge thereof; that as a part of the consideration of such conveyance, and for his interest in such property, Frost became entitled to receive and have issued to him two hundred thousand shares of the stock; that the company having, with that knowledge, issued the stock to Davies, and Davies having received and held it, Frost was entitled to recover from Davies and the company the market value of the stock at the time of its issuance and at the beginning of this suit, with interest thereon.

While the evidence is not presented in the case, there does not seem to be any issue taken upon the facts, but the issues have all arisen from the different legal conclusions arrived at and the different deductions drawn from the facts as agreed upon. The examination of the complaint satisfies us that the facts therein alleged would be sufficient, if fully sustained by the evidence, to constitute a valid cause of action against the defendants, and that the demurrer to the complaint upon the grounds on which it was urged was properly overruled by the court. The remaining two assignments of error, to wit, that the findings of the court are not supported by the allegations of the complaint and the law, and that the court erred in its conclusions of law, are based upon the ground that the allegations of the complaint, and the facts as found by the court within the allegations of the complaint, are not sufficient to sustain an action for fraud against the defendants. The facts in the case, as alleged in the complaint, found by the court, and accepted by counsel on both sides in their pleadings, establish beyond question that on March 12, 1896, Frost and Davies, by mutual understanding and agreement, were jointly interested in the purchase and disposal of the Silver Traill and W. E. Thorne mines; that their relations

were such as to impose mutual obligations on each to deal
with the other in the utmost good faith and candor. In this
enterprise they stood in such relation, and were bound up in
such a community of interests, as forbade either dealing with
the subject-matter of that interest to the detriment or ex-
clusion of the other. As to the purchase and sale of these
mines they stood in the relation of partners, and each, as such,
was agent and trustee for the other. This community of
interests and this partnership relation existing between Davies
and Frost in this transaction on March 12, 1896, rendered it
legally impossible for Davies to surreptitiously secure a new,
option in his own name and for his sole benefit, to the ex-
clusion or detriment of Frost; and his attempt to do so did
not, in equity, work a change of the legal situation in the
escrow agreement, or of the rights of the parties under it,
and left wholly unaffected the one-half interest of each in
the property; Davies becoming, as the legal result of his
action, a trustee of Frost to the extent of the latter's one-
half interest in the property. This being the case, it is not
necessary that actual fraud should be either alleged or found.
The object of the rule which precludes trustees from dealing
for their own benefit in matters to which their trust relates
is to prevent secret frauds by removing all inducements to
attempt them. The rule is not confined to trustees or others
who hold the legal title to the property to be sold, but applies
universally to all who come within its principle, which is that
no party can be permitted to purchase an interest in prop-
erty, and hold it for his own benefit, where he has a duty to
perform in relation to such property which is inconsistent
with the character of a purchaser on his own account. *Ful-
ton* v. *Whitney,* 66 N. Y. 548; *Van Epps* v. *Van Epps,* 9
Paige 241. This rule is aptly expressed in the American note
to *Keech* v. *Sandford,* 1 White & T. Lead. Cas. Eq. 53, as
follows: ''Whenever one person is placed in such a relation
to another, by the act or consent of that other, or the act
of a third person, or of the law, that he becomes interested
for him or interested with him in any subject of property
or business, he is prohibited from acquiring rights in that
subject antagonistic to the person with whose interests he has
become associated.'' Bispham says: ''This rule not only
applies to persons standing in fiduciary relation towards each

other,—such as trustees, executors, attorneys, and agents,—but also to those who occupy any position out of which a similar duty ought, in equity and good morals, to arise." Bisp. Eq., sec. 93. When Davies went to Prescott, March 7, 1896, he went in the interest of himself and Frost. He was the trusted representative of Frost. Frost paid one half of his expenses, and furnished him with a letter of introduction to the owner of the property he went to examine. Frost and he had each paid one half of the first payment on that property. He was there under agreement with Frost that he would either pay the two thousand dollars to become due at an early date, or advise Frost in Chicago in ample time to make that payment. Then, without either returning the money, or repudiating the promise to Frost, or resigning the trust, or making any disclosure to Frost as to his intention, he secretly secured an agreement from Pickrell for a deed that would transfer the property to him individually to the exclusion of Frost. At the time he entered into this agreement he was the trusted agent of the plaintiff, and it was only by the violation of duties that he owed to Frost that he could secure a personal advantage to Frost's detriment. In a similar case to the one at bar—*Miller* v. *O'Boyl* (C. C.) 89 Fed. 140—the court held: "In this matter he was the trusted agent of the plaintiff. If it was open to him at all to throw off his agency and acquire the contract for himself, he could only do so after the frankest disclosures to the plaintiff of all the circumstances, and distinct notice of his intentions to act in his own behalf, to the exclusion of the plaintiff." The observations of Chief Justice Gibson in *Bartholemew* v. *Leech*, 7 Watts, 472, in respect to the incapacity of a confidential agent to acquire title in hostility to his principal, are very pertinent here: "To capacitate him as a purchaser on his own account, he must have explicitly resigned his trust. The most open, ingenuous, and disinterested dealing is required of a confidential agent while he consents to act as such, and there must be an unambiguous relinquishment of his agency before he can acquire a personal interest in the subject of it. To leave a doubt in this respect is to turn himself into a trustee. It is unnecessary to recur to authority for a principle so familiar or so accordant with common honesty." The principle which

lies at the foundation of this and all similar cases is that: "Equity will not allow one to profit by the violation of his own duty. Where a duty rests upon one party in respect to the property of another the violation of or omission of which will result in the sale of the property, the person owing that duty is absolutely disqualified from becoming a purchaser at such sale for his own account." *Bennett* v. *Austin,* 81 N. Y. 322.   Davies, under the law, was, by the conditions under which he acted, constituted a trustee for the benefit of himself and Frost, and the sole effect of his conduct was to make himself, instead of Frost, the holder of the option in the interest of both.   Frost is authorized to treat the subject-matter of the trust as if no change had been made in the situation.   In this situation the conveyance of Davies transferred to the company the interests of both him and Frost, and in equity amounted to exactly the same as if Frost had himself made the conveyance; and by such conveyance Frost became entitled to receive from the company the consideration which was fixed for his interest, namely, two hundred thousand shares of stock.   Of this situation the company had full knowledge.   Davies was himself president of the company. The other members of the board of directors had full knowledge of the whole situation, of the company's agreement with Frost for the transfer of the property on these terms, and of the manner in which Davies had substituted himself for Frost in the instrument of conveyance; and when the company accepted the conveyance of Frost's interest the board of directors joined with the president of the company in the transaction while cognizant of all the facts and of the rights and equities of Frost.   When knowing Davies's relation to Frost, and knowing that he intended to keep all the stock and give Frost nothing, the company gave Davies two hundred thousand shares of stock belonging to Frost, and paid him Frost's expenses, it rendered itself equally liable to Frost in this action.   The judgment in this case, based upon the value of the stock at the time Frost became entitled to it, as found by the court, seems eminently proper, and is abundantly sustained by the facts as shown in the record.   The judgment of the lower court is therefore affirmed.

Street, C. J., and Davis, J., concur.